# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LORRA MANUEL, Derivatively on Behalf of Nominal Defendant AMC ENTERTAINMENT HOLDINGS, INC., | **Case No.** |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| ADAM M. ARON, CRAIG R. RAMSEY, CHRIS A. COX, LINCOLN ZHANG, JACK Q. GAO, LLOYD L. HILL, HOWARD W. KOCH, JR., GARY F. LOCKE, KATHLEEN M. PAWLUS, ANTHONY J. SAICH, and MAOJUN ZENG, | **Jury Trial Demanded** |
| Defendants, | |
| and | |
| AMC ENTERTAINMENT HOLDINGS, INC., | |
| Nominal Defendant. | |

Plaintiff Lorra Manuel, by and through her undersigned attorneys, for her Verified Shareholder Derivative Complaint, alleges upon information and belief, except as to allegations about herself, which are based upon personal knowledge, as follows, upon the investigation of counsel. This investigation included the review of information relating to the relevant time period obtained from various sources—including, *inter alia*, U.S. Securities and Exchange Commission ("SEC") filings, court filings in related civil lawsuits, public reports, press releases, investor conference transcripts, news articles, media reports, and other matters of public record. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## OVERVIEW OF THE ACTION

1.     This is a shareholder derivative action on behalf of nominal defendant AMC Entertainment Holdings, Inc. ("AMC" or the "Company"), a Delaware corporation, against certain of its current and former officers and directors seeking to remedy defendants' breaches of fiduciary duties, for contribution and indemnification, and to recoup certain executive compensation for the benefit of AMC.

2.     AMC is the largest movie theater chain worldwide, with movie theaters throughout the United States and Europe. At all relevant times, box office admissions and food and beverage sales were the primary drivers of AMC's revenues. The balance of the Company's revenues was generated from ancillary sources, including on-screen advertising, fees earned from AMC's customer loyalty program ("Stubs"), theater rentals, gift cards, and online ticketing fees.

3.      In August 2012, AMC was acquired by a private Chinese conglomerate, Dalian Wanda Group Corp. ("Wanda"), in a deal valued at approximately $2.6 billion. In late 2016 and early 2017, under the leadership of defendant Adam Aron ("Aron"), AMC's President and Chief Executive Officer and a director, AMC undertook a series of large acquisitions, including Carmike Cinemas, Inc. ("Carmike"), Odeon and UCI Cinemas Holdings Limited ("Odeon"), and Nordic Cinema Group ("Nordic"), rapidly transforming AMC into the largest theater company in the world. In the course of these events, AMC regularly made positive statements to shareholders and the market regarding integration of these acquisitions and the Company's prospects going forward.

4.     But on August 1, 2017, AMC shocked the market when it issued a press release announcing unexpected and disappointing preliminary results for the second quarter of 2017, causing AMC's common stock price to plummet nearly 27% to $15.20 per share on August 2, 2017, down 57% from its recent high of $35.45. During an earnings conference call to discuss

these dismal results, defendant Aron stated that "the quarter was simply a bust," citing the poor performance of Carmike, Carmike's protracted underinvestment in theaters, AMC's inability to retain Carmike loyalty members, and the seasonality of its international business. None of these trends, events, and uncertainties associated with Carmike and AMC's international business were previously disclosed.

5. On January 12, 2018, investors damaged by the steep stock price decline filed a class action lawsuit against AMC and certain of its officers and directors, including a majority of the current board, alleging violations of the federal securities laws. On August 5, 2018, lead plaintiff Hawaii Structural Ironworkers Pension Trust Fund amended its complaint in the action, alleging that between December 20, 2016 and August 1, 2017, AMC and its officers and directors made false or misleading statements to shareholders and the market about AMC's business, unlawfully inflating the price of AMC securities, and causing massive losses when the truth was finally disclosed. *Hawaii Structural Ironworkers Pension Trust Fund v. AMC Entertainment Holdings, Inc. et al.*, Case No. 1:18-cv-00299-AJN (S.D.N.Y. Nov. 26, 2018).

6. By order dated September 23, 2019 (Docket 137), U.S. District Judge Alison J. Nathan denied in part the defendants' motion to dismiss the securities class action claims. Judge Nathan held that the plaintiff sufficiently alleged that, in AMC's public disclosures during the alleged class period, the Company omitted material information regarding: (i) Carmike's underinvestment in its theaters; (ii) the poor state of Carmike's loyalty program; and (iii) the seasonality of AMC's European business. Judge Nathan further upheld allegations that defendant Aron acted with scienter—or intent to defraud stock purchasers—and that Aron's scienter could be imputed to AMC, the corporate defendant. The Court also held that the plaintiff sufficiently alleged loss causation.

7.     The Court sustained claims against all of the defendants named herein, including a majority of the current board (8 out of 11), under Sections 11 and/or 15 of the Securities Act of 1933, and sustained claims against AMC and defendant Aron under Section 10(b) and/or 20(a) of the Securities Exchange Act. In that action, the defendants are exposed to massive personal liability. The plaintiff has now moved for class certification.

8.     Defendants' misconduct not only caused a massive decline in AMC shareholder value, but has exposed AMC to huge liability to stock purchasers in the securities class action. AMC's officers and directors owe fiduciary duties of care and loyalty to the Company, including a duty to make truthful disclosures to shareholders. They breached this duty. The alleged false and misleading statements were the direct responsibility of the Company's officers and directors.

9.     By causing the Company to issue false and misleading statements, each defendant acted in bad faith and faces a substantial likelihood of liability for breach of fiduciary duty. A majority of AMC's current board is conflicted by the claims asserted against them in the securities class action, which are based on the same factual allegations at issue herein. Under these circumstances, any demand on the board to bring the asserted claims would be futile, and is therefore excused. The directors further lack independence and would never act in a way that might threaten their substantial compensation from AMC, also excusing demand.

10.    This action seeks to recoup losses that AMC has sustained, and will continue sustaining, in connection with the securities class action and any related proceedings, as well as those related to the defendants' breaches of their fiduciary duties to the Company.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. This Court has exclusive jurisdiction pursuant to Section 27 of the Securities Exchange Act,

Case 1:20-cv-02456-AJN Document 1 Filed 03/20/20 Page 5 of 61

15 U.S.C. § 78(aa), because plaintiff's claims arise under Section 21D of the Securities Exchange Act, 15 U.S.C. § 78u-4.

12.     This Court has supplemental jurisdiction over the state-law claims in accordance with 28 U.S.C. § 1367.

13.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because: (a) one or more of the defendants either resides in or maintains offices in this District; and (b) a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

**Plaintiff**

16.     Plaintiff Lorra Manuel is a current holder of AMC stock and has been an AMC shareholder at all times relevant to the claims asserted herein.

**Nominal Defendant**

17.     Nominal defendant AMC is a Delaware corporation with principal executive offices located at One AMC Way, 11500 Ash Street, Leawood, Kansas. According to its SEC filings, AMC is principally involved in the theatrical exhibition business and owns, operates, or has interests in theaters primarily located in the United States and Europe. AMC is an indirect

subsidiary of Dalian Wanda Group Co., Ltd., a Chinese private conglomerate. AMC's Class A common stock trades on the New York Stock Exchange under the symbol "AMC."

**Individual Defendants**

18. Defendant Aron is the President and CEO of AMC and a director of AMC. Defendant Aron's AMC compensation for the fiscal year ended December 31, 2016 totaled $10,932,004. This compensation included $991,200 in salary, a $4.5 million bonus, $4,281,202 in stock awards, $1,144,250 in non-equity incentive plan compensation, and $15,352 in all other compensation. Defendant Aron's compensation for the fiscal year ended December 31, 2017 totaled $7,447,156. This compensation included $1.1 million in salary, $5,605,208 in stock awards, $726,000 in non-equity incentive plan compensation, and $15,948 in all other compensation.

19. Defendant Craig R. Ramsey ("Ramsey") served at all relevant times as Executive Vice President and Chief Financial Officer of AMC. Defendant Ramsey's AMC compensation for the fiscal year ended December 31, 2016 totaled $2,659,220. This compensation included $563,800 in salary, a $700,000 bonus, $962,930 in stock awards, $48,906 in change in pension value and nonqualified deferred compensation earnings, $363,078 in non-equity incentive plan compensation, and $20,506 in all other compensation. Defendant Ramsey's compensation for the fiscal year ended December 31, 2017 totaled $2,347,070. This compensation included $650,000 in salary, $1,399,997 in stock awards, $126,217 in change in pension value and nonqualified deferred compensation earnings, $150,150 in non-equity incentive plan compensation, and $20,706 in all other compensation. Ramsey retired from AMC effective February 28, 2020.

20.     Defendant Chris A. Cox ("Cox") has been Senior Vice President and Chief Accounting Officer of AMC since June 2010. Defendant Cox served in various other capacities within the Company since November 2000.

21.     Defendant Lincoln Zhang ("Zhang") is AMC's non-executive Chairman and an AMC director. Zhang was a director and Chairman of AMC from August 2012 until his resignation on March 12, 2018. Zhang rejoined AMC's board beginning on December 2, 2019 and is described in AMC's SEC filings as an employee of AMC's controlling stockholder, Wanda. As of the filing of AMC's 2017 Proxy Statement, Defendant Zhang was described as the President of Wanda Cultural Industry Group, a position he held since 2012. Zhang also served on the board of directors of Wanda Cinemaline Corporation since November 2006, Dalian Wanda Commercial Properties Co., Limited since December 2009, and Dalian Wanda Group Co., Limited since February 2011.

22.     Defendant Maojun Zeng ("Zeng") has been a director of AMC since February 2016 and served as AMC's non-executive Chairman between March 14, 2018 and December 2, 2019. As of the filing of AMC's 2017 Proxy Statement, Defendant Zeng was described as the President of Wanda Cinema Line Co., Ltd, a subsidiary of Wanda Group, since March 27, 2014, and a member of its Board of Directors since July 30, 2013. Zeng previously served as the Assistant to the President of Wanda Cultural Industries Group and Vice President of Wanda Cinema Line Corporation since February 28, 2012.

23.     Defendant Anthony J. Saich ("Saich") has been a director of AMC since August 2012 and is a member of the Audit Committee and Chair of the Nominating and Corporate Governance Committee. For the fiscal year ended December 31, 2016, Defendant Saich received $163,704 in compensation from the Company, including $65,000 in fees earned or paid in cash and $98,704 in stock awards. For the fiscal year ended December 31, 2017, Defendant Saich

received $231,265 in compensation from the Company, including $165,000 in fees earned or paid in cash and $66,265 in stock awards.

24.     Defendant Lloyd Hill ("Hill") has been a director of AMC since December 2013 and is a member of the Audit Committee. For the fiscal year ended December 31, 2016, Defendant Hill received $168,704 in compensation from the Company, including $70,000 in fees paid or earned in cash and $98,704 in stock awards. For the fiscal year ended December 31, 2017, Defendant Hill received $226,455 in compensation from the Company, including $150,000 in fees paid or earned in cash and $76,455 in stock awards.

25.     Defendant Gary F. Locke ("Locke") has been a director of AMC since February 2016 and is a member of the Nominating and Corporate Governance Committee. For the fiscal year ended December 31, 2016, Defendant Locke received $145,725 in compensation from the Company, including $48,715 in fees earned or paid in cash and $97,010 in stock awards. For the fiscal year ended December 31, 2017, Defendant Locke received $223,924 in compensation from the Company, including $68,813 in fees earned or paid in cash and $155,111 in stock awards.

26.     Defendant Howard W. Koch, Jr. ("Koch") has been a director of AMC since October 2014 and is a member of the Nominating and Corporate Governance Committee. For the fiscal year ended December 31, 2016, Defendant Koch received $158,704 in compensation from the Company, including $60,000 in fees paid or earned in cash and $98,704 in stock awards. For the fiscal year ended December 31, 2017, Defendant Koch received $226,265 in compensation from the Company, including $160,000 in fees paid or earned in cash and $66,265 in stock awards.

27.     Defendant Kathleen M. Pawlus ("Pawlus") has been a director of AMC since December 2014 and serves as Chair of the Audit Committee. For the fiscal year ended December 31, 2016, Defendant Pawlus received $163,704 in compensation from the Company, including

8

$65,000 in fees earned or paid in cash, and $98,704 in stock awards. For the fiscal year ended December 31, 2017, Defendant Pawlus received $236,265 in compensation from the Company, including $170,000 in fees earned or paid in cash and $66,265 in stock awards.

28.     Defendant Jack Q. Gao ("Gao") was a director of AMC from September 2015 until his resignation on October 27, 2017. As of the filing of AMC's 2017 Proxy Statement, Defendant Gao was described as the Group Vice President of Wanda Cultural Industry Group and the Chief Executive Officer of Wanda Film Holdings Company and had held such positions since joining the Wanda Group in June 2015. Sometime in or after February 2017, Defendant Gao received a bonus payment of $1,500,000 related to his service as a director of AMC.

29.     Defendants Aron, Ramsey, Cox, Zhang, Zeng, Saich, Hill, Locke, Koch, Pawlus, and Gao are sometimes collectively referred to herein as the "Individual Defendants."

30.     Defendants Aron, Zhang, Zeng, Saich, Hill, Locke, Koch, and Pawlus are sometimes collectively referred to herein as the "Current Director Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     By reason of their positions as officers, directors, and fiduciaries of AMC and because of their ability to control its affairs, each of the Individual Defendants owed AMC and its shareholders fiduciary duties of care and loyalty in the management and administration of AMC's affairs, as well as in the use and preservation of AMC's property and assets.  As such, they were required to act in furtherance of the best interests of AMC and its shareholders and prohibited from engaging in unlawful corporate conduct, such as violations of the laws applicable to AMC and its business.

32.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate complete, accurate, and truthful information

regarding AMC's business, operations, management, and corporate conduct so that the market price of AMC stock would be based on truthful and accurate information.

33.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of AMC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. The misconduct of the Individual Defendants involves a culpable violation of their obligations, the absence of good faith on their part, and a reckless disregard for the fiduciary duties owed to AMC and its shareholders, which they were aware or should have been aware posed a risk of serious injury to AMC.

34.     At all relevant times, each Individual Defendant was the agent of each other and of AMC, and was acting within the course and scope of such agency.

### SUBSTANTIVE ALLEGATIONS

### Background of AMC's Operations and Relevant History

35.     AMC owns, operates, or has interests in theaters internationally. AMC offers consumers traditional film programming, independent and foreign films, performing arts, and music and sports programming. At its theaters, the Company also sells food and beverage products, including made-to-order meals, coffee, snacks, beer, wine, cocktails, and dine-in theater options.

36.     The Company's revenues are derived primarily from box office admissions. Its next largest source of revenue is from theater food and beverage sales, but AMC also generates revenue from other sources, including on-screen advertising, fees earned from "Stubs" (its customer loyalty program), the rental of theater auditoriums, income from gift card and exchange ticket sales, and online ticketing fees.

37.     The Stubs loyalty program allows members to earn rewards, receive discounts, and participate in exclusive offerings and services. AMC claims that the Stubs program strengthens

guest loyalty, attracts new guests, and drives return visits. As of December 31, 2016, more than 5.2 million active member households were enrolled in AMC's Stubs program.

38.     In 2011, AMC began a project to replace existing seats with electric recliners, costing approximately $450,000 per screen, or approximately $5 million per theater. As part of this initiative, AMC also sought to improve its theater lobbies, concessions, and bathrooms, and upgraded its theater technologies. Appealing to a new generation, AMC also began to offer a wider range of food and beverage alternatives that went beyond the traditional assortment of popcorn, candy, snacks, and sodas.

39.     These improvements to AMC's theater offerings—though more expensive for consumers—yielded significant financial returns for the Company. AMC's upgrades have been well received by consumers, particularly because its theaters are primarily located in more affluent metropolitan markets.

40.     In August 2012, Wanda acquired AMC in a $2.6 billion deal. At that time, AMC operated 346 multiplex theaters—mostly located in the U.S. and Canada—comprising over 5,000 screens. As a part of the deal, Wanda announced that it planned to invest as much as $500 million in AMC. AMC eventually went public in December 2013, but Wanda retained a majority of the shares and firm control of the Company.

**Appointment of Defendant Aron as CEO and AMC's Acquisition of Carmike**

41.     AMC appointed Aron as CEO on December 15, 2015, replacing his predecessor, Gerry Lopez, who had resigned that August. Aron assumed his duties on January 4, 2016 and immediately embarked on an aggressive and poorly managed acquisition spree that included significant acquisitions of Carmike, Odeon, and Nordic, making AMC the largest theater company in the world.

42.     Adhering to the adage "Time is the enemy of all deals," Aron wasted absolutely none of it in engaging with the CEO of Carmike, stating in an interview published on March 4, 2016: "I called the CEO of Carmike on my first week of the job . . . We had dinner on the third week. There was no reason to go slow." AMC and Carmike quickly issued a joint press release on March 3, 2016 announcing their intent to complete the acquisition, pursuant to a definitive merger agreement, for approximately $1.1 billion.

43.     At the time, AMC agreed to acquire all of Carmike's outstanding shares for $30.00 per share in cash and to assume Carmike's net indebtedness, funding the transaction with cash on hand and incremental debt financing from Citigroup (the "March 2016 Debt Commitment"). The March 2016 Debt Commitment included a senior secured incremental term loan in an aggregate amount of up to $560 million and a senior subordinated bridge loan in an aggregate amount of up to $300 million.

44.     Aron justified the acquisition to investors at a March 4, 2016 conference call in which he cited the two companies' complementary geographic footprints, with AMC's legacy theaters being located in major metropolitan markets, especially in the Northeast, Midwest, and on the West Coast, while Carmike operated a hometown theater chain serving mid-size, non-urban markets across the country, particularly in the South and Southeast.

45.     But there was a fundamental flaw with this rationale. AMC's pre-acquisition strategic growth initiatives, including its redesigned seating and expanded menu options, among other things, had been very successful for the Company in large part because they appealed to the more affluent metropolitan consumers in its legacy markets. That new type of theater experience— which costs more for patrons—was not compatible with the hometown, non-urban markets it was acquiring in the Carmike deal. Accordingly, Aron explained to investors in March 2016 that AMC

would not be embarking on full-scale redesign in these new, hometown markets as it had previously done in its legacy markets. Instead, Aron said the Company would only redesign approximately 15% of Carmike's movie screens with fancier reclining chairs and would do so over a five-year period, costing the Company an estimated $50 to $60 million. Explaining that AMC would largely retain Carmike's "lower cost structure at theaters with lower visitation," Aron said the Company "will be laser-like in our pursuit of cost synergies, whether that be film exhibition expense, concessions, operating expense, G&A, overhead cost, you name it, we will be turning over every rock to get those synergies that are out there for the taking . . . ."

46.     On July 25, 2016, AMC announced that it had entered into an amended and restated merger agreement with Carmike pursuant to which AMC agreed to acquire all of the outstanding shares of Carmike for $33.06 per share in cash and stock (up from $30.00 per share), and to assume Carmike's net indebtedness. AMC also entered into an amended and restated debt financing commitment (the "July 2016 Debt Commitment") with Citigroup, Merrill Lynch, Credit Suisse, HSBC Securities (USA) Inc., HSBC Bank USA, N.A, Barclays Bank PLC, Credit Suisse AG, and Bank of America, N.A. The July 2016 Debt Commitment included a senior secured incremental term loan in an aggregate amount of up to $225 million (down from the $560 million in the March 2016 Debt Commitment) and a senior subordinated bridge loan in an aggregate amount of up to $300 million.

47.     On December 21, 2016, AMC completed its acquisition of Carmike for $858.2 million, including $584.3 million in cash, 8.2 million shares of AMC common stock worth $273.9 million, and the assumption of $230 million of Carmike debt. To finance the acquisition, AMC entered into a $350 million bridge loan agreement with Citicorp North America, Inc., as administrative agent, and Citigroup, Merrill Lynch, and Credit Suisse as joint lead arrangers and

bookrunners. In the acquisition, AMC acquired 271 Carmike theaters in 41 U.S. states comprising 2,923 screens.

48.     That same day, December 21, 2016, AMC filed with the SEC a Form S-3 registration statement, incorporating a prospectus and prospectus supplements (collectively referred to herein as the "Registration Statement"),[1] offering to sell to the public 21,904,761 shares of common stock, including 2,857,142 shares pursuant to an overallotment option issued to the Company's underwriters, at a price of $31.50 per share. The Registration Statement provided AMC with net proceeds of approximately $618 million.

### AMC's Acquisitions of Odeon and Nordic

49.     Continuing the merger spree, on November 30, 2016, AMC announced it had completed the acquisition of Odeon, the largest theater operator in Europe. In a transaction valued at approximately $1.2 billion, AMC acquired Odeon in exchange for $480.3 million in cash, 4.5 million shares of AMC common stock worth $152.7 million, and the repayment of $593.2 million of Odeon debt. As of the acquisition date, Odeon operated 242 theaters with 2,243 screens in the United Kingdom, Spain, Italy, Germany, Austria, Portugal, and Ireland. To fund the acquisition, AMC relied in part on borrowing an additional $500 million.

50.     Upon completion of the Odeon acquisition, AMC began operating under two reportable business segments: the U.S. markets segment and the International markets segment.

51.     AMC was not done with its flurry of corporate deals. In addition to Carmike and Odeon, on January 23, 2017, AMC announced it had agreed to acquire yet another company, Nordic, the largest theater exhibitor in Scandinavia and the Baltic nations. In connection with the announcement, AMC entered into another debt financing commitment (the "January 2017 Debt

---

[1] AMC filed its prospectus supplements with the SEC on February 7 and 9, 2017.

Commitment") with Citigroup, pursuant to which Citigroup agreed to provide AMC with a $675 million term loan and a $325 million bridge loan. To fund the Nordic acquisition, AMC issued $475 million and £250 million in notes on March 17, 2017.

52.     On March 28, 2017, AMC completed the Nordic acquisition in an all-cash transaction valued at $964 million. As of March 31, 2017, Nordic operated 71 theaters with 467 screens in approximately 50 large- and medium-sized cities in Scandinavia and the Baltic nations. Nordic also held a substantial minority investment in 51 other theaters comprising 216 additional screens.

53.     As of December 31, 2017, the Company owned, operated, or held interests in 649 theaters with a total of 8,224 screens in the United States and 365 theaters with 2,945 screens in Europe.

**AMC's Reliance on Debt to Finance Its Aggressive Acquisitions**

54.     To finance these several large-scale acquisitions, AMC relied in part on a secondary public offering which it undertook on or around February 8, 2017 (the "SPO") pursuant to the December 2016 Registration Statement. According to the Registration Statement, the purpose of AMC's February 2017 SPO was to help finance the above deals, with AMC specifically intending to use the proceeds to repay the $350 million bridge loan connected with the Carmike acquisition and to finance a portion of the Company's Nordic acquisition.

55.     As a result of the acquisitions of Carmike, Odeon, and Nordic, AMC's debt and other obligations ballooned to unsustainable proportions. Counting just the Carmike and Odeon acquisitions, between September 30 and December 31, 2016, AMC's debt nearly ***doubled*** from $3.4 billion to $6.6 billion. Furthermore, according to the December 2016 Registration Statement, AMC was obligated to service approximately $6.8 billion in new rental payments in connection

15

with the same acquisitions. As discussed above, AMC's debt grew even further in connection with its acquisition of Nordic in early 2017.

56.     Making matters worse, due to pressure from the Chinese government, Wanda (AMC's controlling shareholder) reportedly pulled the rug out from any further financial support. On July 17, 2017, a leaked document purportedly reflected orders from the Chinese government that state-run banks should stop lending money to Wanda for Wanda's use with several of its overseas acquisitions, including AMC's deals for Carmike and Nordic. The document also reflected orders to the banks that they should not help the overseas projects with any foreign currency or financial registrations, and that Wanda itself should not inject any of its own assets into the acquired companies. AMC responded the next day, denying suggestions that any funding from Wanda was used in its recent acquisitions. Defendant Aron later bristled at what he considered "misreporting" and "wild speculation" on the matter. Nevertheless, to the extent such financing would have been helpful, AMC was completely cut off from it.

57.     AMC was highly overleveraged because of these acquisitions, making the Company vulnerable. The December 2016 Registration Statement warned investors that AMC had "substantial debt" that could limit the Company's ability to obtain future financing and consume a substantial portion of its cash flow from operations. Defendant Aron, despite being the chief architect of AMC's acquisition strategy, admitted to securities analysts prior to the SPO that he would have been "much more comfortable" if AMC's debt were lower.

58.     The Company's solvency was at risk and it had no available backstop from its controlling shareholder. Thus, the SPO was designed primarily to deleverage the Company and to help remove AMC from its precarious financial position.

**Materially False and Misleading Statements and**
**Omissions in the Registration Statement**

59.     Throughout the relevant time period, AMC made materially false and misleading statements to investors and omitted material information that it should have disclosed. Significantly, the December 2016 Registration Statement contained several inaccuracies and misleading statements and omissions. It failed to identify and disclose known trends, events, demands, commitments, and uncertainties that were known to management and were then having, and were reasonably likely to continue to have, material adverse effects on AMC's operating performance. These included that: (i) Carmike's theaters were in a state of significant disrepair because it had stopped investing in its theaters over a protracted period; (ii) Carmike had experienced a significant loss in market share when its patrons migrated to competitors that had renovated and upgraded their theaters; and (iii) AMC had been unable to retain or convert Carmike's loyalty program members after the acquisition.

60.     On August 4, 2017, AMC held a conference call with investors and securities analysts to discuss AMC's operating results for the period ended June 30, 2017. During the call, Aron told investors that "the quarter was simply a bust" because of four specific matters that were having a material adverse effect on the Company's results. One of the four matters identified by AMC was the performance of Carmike, demonstrating just how misleading the Company's December 2016 Registration Statement had been.

61.     Aron stated that the recently-acquired Carmike theaters had a revenue decline of 11.3% during the 2017 second quarter, while the Company's legacy AMC theaters, which he referred to as "stars," outperformed relative to the U.S. box office average.

62.     During the call, Aron specifically identified three reasons for Carmike's poor results, including that Carmike had been experiencing a prolonged period of financial

underperformance due, in large part, to a protracted period of underinvestment in its theaters: "[W]hen you look at what Carmike as a company did between April and December [of 2016] to modernize its circuit after it put itself under contract to be sold, it didn't do very much. And so the circuit essentially went on dead stop around April-ish of . . . '16. . . ." Aron further noted that "about 40% of the attendance issues in the Carmike circuit was because somebody came into town and put a recliner theater near a Carmike theater and Carmike never responded."

63. Aron also explained that Carmike had experienced a significant loss in market share during 2016 when its patrons migrated to competitors that had renovated and upgraded their theaters. Aron stated on the call that, "in 8 of the 12 months in '16, Carmike, as a circuit, had declining market share, including . . . 3 of the 4 months between September and December. . . ."

64. Aron also explained during the August 2017 call that AMC was able to retain only a very small number of Carmike's loyalty program members after the Carmike acquisition, noting, "[w]hen Carmike was handed over to us on December 21, [2016,] only 200,000 individuals from their loyalty program joined our loyalty program. . . . So we've had to start the loyalty program essentially over from scratch."

65. Thereafter, Aron commented that the above-noted reasons were among the "many" factors contributing to Carmike's underperformance and that "it's going to take us a good year to essentially turn around Carmike. So I do think this [underperformance] is going to continue with us until '18."

66. These undisclosed material trends, events, and uncertainties associated with Carmike, which were reasonably likely to have a material adverse effect on the Company's operating results at the time of the SPO, were required to be disclosed in, but were omitted from, the December 2016 Registration Statement.

18

67.     The December 2016 Registration Statement also incorporated by reference a number of documents, including Carmike's Form 10-Q for the quarter ended September 30, 2016 (the "Q3 2016 Carmike 10-Q"), which contained false and misleading statements regarding Carmike's revenue growth over the first three quarters of 2016. In relying upon those rosy statements regarding Carmike's revenue growth in the first nine months of 2016, the Registration Statement failed to disclose material changes in Carmike's affairs, including that Carmike's theaters were in a state of significant disrepair because it had stopped investing in its theaters over a protracted period and that Carmike had experienced a significant loss in market share when its patrons migrated to competitors that had renovated and upgraded their theaters.

68.     The December 2016 Registration Statement also included materially inaccurate statements and omissions regarding Odeon, including the failure to disclose that AMC's international markets segment experienced lower sales during the summer months. The Registration Statement falsely represented that AMC's business was seasonally stronger during the summer months, stating, in pertinent part, that "[t]he most attended films are usually released during the summer and the calendar year-end holidays, making our business highly seasonal." Similar statements were also made in AMC's 2015 Form 10-K, which was incorporated by reference in the Registration Statement.

69.     These statements were materially inaccurate because, contrary to the above-noted disclosures, Odeon's operations, a major part of AMC's international business segment, generally experience much lower attendance and revenues during the summer months. This misrepresentation had real effects on investors and analysts, causing securities analysts to model AMC's post-SPO earnings incorrectly. Accordingly, the December 2016 Registration Statement contained materially inaccurate information about the seasonality of AMC's operations.

19

70.     The materially false and misleading December 2016 Registration Statement was signed by Defendants Aron, Ramsey, Cox, Zhang, Zeng, Saich, Hill, Locke, Koch, Pawlus, and Gao.

### Other Materially False and Misleading Statements and Omissions

71.     The Individual Defendants also made materially false and misleading statements beyond those made in the December 2016 Registration Statement, including regarding the operations of Carmike and the Company's recently-acquired international businesses, Odeon and Nordic.

72.     Regarding Carmike, Defendants knew but failed to disclose that: (i) AMC's operating performance was adversely affected by a protracted period of underinvestment in Carmike's theaters; (ii) Carmike experienced a significant loss in market share when its patrons migrated to competitors that had renovated and upgraded their theaters; and (iii) AMC was unable to retain or convert Carmike's loyalty program members into AMC's Stubs loyalty program after the acquisition. Instead, AMC and the Individual Defendants made rosy statements about: (i) migrating Carmike's loyalty program members to AMC Stubs; (ii) Carmike's patron visitation levels; (iii) member growth in AMC's Stubs program; and (iv) the enhancement of AMC's growth potential by joining forces with Carmike.

73.     Regarding Odeon and Nordic, the Individual Defendants knew but failed to disclose that AMC's newly-acquired international operations were slower during the summer season, which caused analysts to model AMC's post-acquisition performance incorrectly, with one analyst specifically noting that AMC's omissions "played a role in our (and likely the Street's) mismodeling of [AMC's 2017 second] quarter."

74.    ***December 20, 2016 Conference Call***. On December 20, 2016, AMC announced that it had obtained U.S. Department of Justice approval necessary to complete the Carmike acquisition and discussed the acquisition in a conference call with analysts and investors.

75.    On the call, Aron noted that during AMC's due diligence process, AMC determined that "there are plenty of Carmike theaters that are substantial enough in their visitation or locales to graduate, so to speak, into the AMC brand," and that, "[w]e have identified that there are an easy 50 to 100 Carmike theaters that are capable of supporting an AMC-style renovation." Such a renovation, as discussed above, involved upgrading those theaters to AMC-style recliner seating. Aron told investors that "being maniacal about cost management is extremely important," adding "we're pleased by the two-brand strategy because we'll have one set of operating standards for AMC theatres, another set of operating standards for the second brand theatres, and that will allow us to be more focused on managing costs at each brand at the appropriate level."

76.    Regarding theater attendance and renovation, Aron also stated the following:

We do think the fact that we're going to commit to renovate a significant number of AMC theaters ***and a significant number of Carmike theaters*** and a significant number of Odeon theaters is going to cause attendance at those theaters to increase. That's good for studios, that's good for us.

\* \* \*

We are in the business as all companies are rationally deploying and allocating capital and we will put our monies where we get the best returns as best we can figure out what they'll be. There is opportunity for investment at the AMC circuit. ***There's opportunity for investment at the Carmike circuit*** and there's opportunity for investment at the Odeon circuit. I expect that you will see us make improvements at each of the three circuits, although as I said on the margin, we ration capital where it produces the highest return. And so, we look at these projects one at a time, theater by theater.

(Emphasis added.)

77.     Aron's statements above regarding the Carmike theaters' potential for "AMC-style renovations" and AMC's "[focus] on managing costs at the appropriate level" were knowingly or recklessly false and misleading because Aron and the other Individual Defendants never disclosed that Carmike had allowed its theaters to stagnate without capital investment between April and December of 2016. Aron's statements were also knowingly or recklessly false and misleading because he and the other Individual Defendants never disclosed that a protracted period of underinvestment in Carmike's theaters had caused Carmike to lose market share to competitors which would require significant time and investment to reverse.

78.     The Individual Defendants also hid that the undisclosed problems with Carmike's protracted underinvestment in its theaters and resulting loss in Carmike's market share would have a material adverse effect on AMC's capital resources and operating results.

79.     ***January 23, 2017 Conference Call***. On January 23, 2017, AMC announced that it had entered into a definitive agreement to acquire Nordic and hosted a conference call that day with analysts and investors to discuss the acquisition.

80.     During the call, Aron also touted the execution of AMC's integration of Carmike and Odeon as having been "flawless," and reiterated his unwavering confidence that such acquisitions would have a positive impact on the Company's future:

> So far, vis-a-vis Carmike and Odeon, our efforts as best we can tell, surrounding integration planning and integration execution have been ***flawless***. . . . Allocating our capital so dramatically to growth through acquisition, in both our theater count and countries served ***obviously confirms that AMC is confident and optimistic about the future of being in the movie theater business. We further believe that confidence is well-placed***.

(Emphasis added.)

81.     Aron's statements regarding the "integration" and investments in Carmike and the benefits of acquiring Carmike's operations were knowingly or recklessly false and misleading

because Aron and the other Individual Defendants never disclosed that Carmike had allowed its theaters to stagnate without capital investment between April and December of 2016. Aron's statements were also knowingly or recklessly false and misleading because he and the other Individual Defendants never disclosed that a protracted period of underinvestment in Carmike's theaters had caused Carmike to lose market share to competitors which would require significant time and investment to reverse.

82.     Aron also proclaimed that the Company's acquisitions, including Carmike and its loyalty program, were going to help grow AMC's revenues and EBITDA, and that the Company's renovation efforts were also going to generate growth:

> *I think AMC has grown smartly this year, through M&A activity*. It's not the only way we've grown, but I like our new website, and I like our new AMC Stubs loyalty program, and I like our new pricing department, and *they're going to help us grow revenues and grow EBITDA*, too. But, and we are obviously investing in renovating theaters in the US and putting in recliner seating to another third of our circuit over the next two years, so *there's plenty that's going to cause growth*.

(Emphasis added.)

83.     Aron's statements above proclaiming how the "new AMC Stubs loyalty program" would "help" AMC "grow revenues and grow EBITDA, too" were knowingly or recklessly false and misleading because Aron and the other Individual Defendants never disclosed that AMC had lost most of Carmike's loyalty program members upon completing the Carmike acquisition and, as Aron finally admitted later, "had to start the loyalty program essentially over from scratch."

84.     During that same call, Aron announced that AMC's acquisition of Nordic would close in time to benefit from a "busy summer film slate:"

> Like in our Odeon transaction, European Commission approval will be required for closing, but as we've had recent experience with [the] EU, and as we have no theaters in these seven Northern European countries presently, we believe that securing EU approval should be both painless and quick. We expect closing to happen well within the first half of 2017, and *ahead of the busy summer film slate*.

(Emphasis added.)

85.    Aron's statement regarding the financial benefits accruing from its acquisition of Nordic, with specific emphasis on "the busy summer film slate," was knowingly or recklessly false and misleading because Aron failed to disclose that the slow summer seasons in the legacy Odeon and Nordic circuits would offset any purported benefits from the acquisitions.

86.    Furthermore, Aron failed to disclose on the January 23, 2017 conference call that the problems with Carmike's protracted underinvestment in its theaters, the resulting loss in market share, and AMC's inability to retain Carmike's loyalty program members would have a material adverse effect on AMC's capital resources and operating results.

87.    ***2016 Fourth Quarter and Year-End Results and Form 10-K***. On February 28, 2017, AMC announced its 2016 fourth quarter and year-end financial results, highlighting AMC's record-setting fourth quarter and year-end results across its revenue categories, including admissions, food and beverage, and "other," and commenting that the SPO's proceeds would be used to pay for AMC's recent acquisitions.

88.    After the earnings announcement, AMC held a conference call with analysts and investors to discuss the Company's operations and performance. During the call, Aron announced that AMC had set all-time revenue and EBITDA records in 2016 and that the "record we set in 2016 is one that we will literally shatter in 2017:"

> AMC set new ***all-time high records*** for every revenue segment and adjusted EBITDA, exceeding $3 billion in total revenues for the first time ever, growing nearly 10% to a record $3.2 billion. ***That $3.2 billion record we set in 2016 is one that we will literally shatter in 2017, with revenues that are likely to well exceed $5 billion***.

(Emphasis added.)

89.     In addition, Aron highlighted the importance of the Company's Stubs loyalty program and announced that, since its recent redesign, its membership had "exploded," with "stunning" new-member household sign-up rates:

> During the latter half of 2016, we revolutionized our already successful loyalty program, redesigning and relaunching AMC Stubs. AMC Stubs had been locked in with about 2.5 million member households but without meaningful growth in some three years. By contrast, ***membership in the redesigned AMC Stubs has simply exploded***.
>
> AMC Stubs membership has just recently crossed over the six million member household mark. Some 5.5 million of these households have purchased an AMC ticket in the past 12 months and all have had some interaction with us in the past 24 months. ***With sign-up rates of a stunning 400,000 to 500,000 new member households continuing right now each month, we hope that we can reach 10 million member households in the AMC Stubs program and the AMC customer database sometime in 2017***.
>
> With an average of roughly three to four family members per household, our consumer database has already grown to approximately 20 million known moviegoers and should rise to 30 million to 40 million known moviegoers by later this year. To whom, we are marketing one to two times each week to sway them to see a movie, the kind of movie that they individually prefer based on past purchases and to do so at an AMC theater.
>
> ***I just cannot emphasize enough the value to our Company, of this consumer data and information. We intend to creatively mine this rapidly growing consumer database to increase sales and otherwise boost loyalty to AMC***.

(Emphasis added.)

90.     Aron's statement regarding the "explo[sion]" of AMC's Stubs loyalty program was knowingly or recklessly false and misleading because Aron and the other Individual Defendants never disclosed that AMC had lost most of the members of Carmike's loyalty program upon completing the Carmike acquisition and "had to start the loyalty program essentially over from scratch," as they later were forced to admit.

91.     Aron also represented that 2017 would be a "transition" year for Carmike, with

AMC having to incur "start-up and transition costs." He commented that the benefits from

"recliner renovations" would not be visible until very late in 2017 and 2018:

> . . . 2017 will be a transition year for Odeon and Carmike Theaters. There are start-up and transition costs; additionally, since the recliner renovations deployments take on average six to 12 months to complete and although we have already begun, the lift in these investments won't be visible until very late in 2017 and well into 2018. Having said all that, these are absolutely the right investments to make and *we are very confident in their earnings power*.
>
> The Carmike acquisition combined, as you know, the number two and number four circuits in the US to create the largest exhibition circuit in the US. Carmike offers AMC -- excuse me, one second. Carmike offers AMC complementary markets in suburban and rural regions of the country, with little market overlap and gives AMC a truly national footprint. *We will deploy some of our strategic growth initiatives at every Carmike Theater and many will be renovated full-blown with recliner seating*.
>
> We have also identified $35 million of cost synergies, which we believe will be substantially realized by the end of 2017. We've already begun the integration in earnest, converting point-of-sale systems and vendor contracts and commencing initiative deployments.

(Emphasis added.)

92.     Aron's statements were knowingly or recklessly false and misleading because Aron

referred to 2017 as being Carmike's "transition year" because of "start-up and transition costs"

and "recliner renovations." In truth, however, Aron knew but failed to disclose that Carmike's

operations were suffering from a protracted period of underinvestment, a material loss in market

share, and that AMC was unable to retain or convert loyalty program members after the

acquisition. Aron knew these facts would have a material adverse effect on AMC's capital

resources and operating results.

93.     Aron also noted that 2017 consensus revenue and earnings estimates of securities

analysts "seem to be in the right ballpark." Per *Thomson First Call*, the consensus Wall Street

estimates at that time were $5.044 billion in revenue and $1.04 in EPS for full-year 2017. Aron's statement regarding AMC's 2017 guidance was knowingly or recklessly false and misleading because the numerous, undisclosed operational issues discussed above were having and were likely to continue to have an adverse effect on AMC's operations. Aron's 2017 financial guidance was wholly without any reasonable basis.

94.     During the Q&A session of the conference call, Aron continued to mislead investors and make materially false and misleading statements about renovations at AMC's theaters. In response to an analyst question regarding the "relative performance of theaters that have not been reseated or given enhanced food and beverage," a question specifically asked to understand "the potential level of drag those theaters are having on the overall average," Aron glossed over the significant problems at legacy Carmike theaters:

> … [W]hat is the difference between the renovated theaters and non-renovated theaters? . . . Well, ***when you renovate theaters, okay, you get a big pop***. Does it sort of then, like, disappear? And the answer is no. Once we get our big pop and that tends to institutionalize the renovated theaters doing really well and they stay up there at the renovated -- at the elevated level of performance.

> Where we are exposed, and where I believe our competitor is exposed, is that our renovated theaters, whether they were renovated three months ago or 24 months ago, ***our renovated theaters, as a class, are doing extremely well, with significant double-digit revenue growth that would blow your mind if we shared that number with you***.

> ***But, the non-renovated theaters are growing at single-digit growth, which blows our minds because we are the same Company, which shows us the power of recliner seats. So, our conclusion is the faster we can renovate theaters, the better off we are***.

> … [Y]ou'll start to see Carmike Cinemas getting renovated in 2018 but, that's probably an 2018, 2019 and -- or 2018 and 2019, or 2018, 2019, and 2020 renovation plan. There is no doubt that renovated theaters are just killing in the marketplace.

> ***Consumers are voting with their feet. And our way to handle that is to have more theaters that are renovated than anybody else and it will be by a country mile***. We

already have a big lead over any other large circuit in terms of renovation. And our plans for 2017 and 2018 are more aggressive than anybody else as well.

(Emphasis added.)

95.     Aron's statements were knowingly or recklessly false and misleading because Aron knew that Carmike's renovations included the need to address the protracted period of underinvestment and the resulting loss of market share due to patrons' migration, which would require significant time and investment from AMC.

96.     On March 10, 2017, AMC filed its 2016 Form 10-K with the SEC, signed by Aron, Ramsey, Cox, Gao, and the Current Director Defendants. The 2016 Form 10-K contained materially false and misleading disclosures and omissions relating to: (i) the operations of Carmike; (ii) the seasonality of AMC's foreign operations; (iii) the Company's Stubs loyalty program; (iv) AMC's MD&A; (v) AMC's financial statements; (vi) AMC's disclosure controls; and (vii) the certifications signed by Aron and Ramsey regarding AMC's disclosure controls.

97.     With respect to Carmike, the 2016 Form 10-K disclosed the following:

Legacy Carmike theaters are located primarily in smaller, suburban and rural markets, which affects total revenues per theater. *However, in general, theaters located in smaller suburban and rural markets tend to have less competition and a lower cost structure, and we believe when combined with our innovative strategic initiatives that productivity will improve*.

* * *

In December 2016, we completed the acquisition of Carmike for cash and stock. The purchase price for Carmike was $858.2 million comprised of cash of $584.3 million and 8,189,808 shares of our Class A common stock with a fair value of $273.9 million (based on a closing share price of $33.45 per share on December 20, 2016). We also assumed $230.0 million aggregate principal amount of 6.00% Senior Secured Notes due June 15, 2023 (the "Senior Secured Notes due 2023"), in connection with the acquisition of Carmike. As of December 21, 2016, Carmike operated 271 theaters with 2,923 screens in small and mid-sized markets in 41 states, which further complements our U.S. markets segment. *We expect to realize approximately $35.0 million of synergies and cost savings related to this acquisition as a result of purchasing and procurement economies of scale and*

28

*general and administrative expense savings, particularly with respect to the consolidation of corporate related functions and elimination of redundancies*.

(Emphasis added.)

98.     The above statements were knowingly or recklessly false and misleading when made because the Individual Defendants had a duty to disclose all material facts regarding Carmike when discussing its operations. Specifically, the Individual Defendants never disclosed that Carmike had allowed its theaters to stagnate without any capital investment between April and December 2016, that this protracted period of underinvestment in Carmike's theaters had caused Carmike to lose an increasing percentage of its market share to competitors, and that these effects would require significant time and investment from AMC to reverse course. Additionally, the Individual Defendants did not disclose the resulting material adverse effects of this underinvestment on AMC's capital resources and operating results.

99.     Concerning the seasonality of AMC's business, the 2016 Form 10-K disclosed the following, completely ignoring the contra-seasonality of its new European acquisitions:

> Our revenues are dependent upon the timing of motion picture releases by distributors. The most marketable motion pictures are usually released during the summer and the year-end holiday seasons. Therefore, *our business is highly seasonal, with higher attendance and revenues generally occurring during the summer months and holiday seasons*. Our results of operations may vary significantly from quarter to quarter.

(Emphasis added.)

100.    The statements above were knowingly or recklessly false and misleading because AMC's 2016 Form 10-K was required to disclose the seasonality of each of its business segments, including specific disclosures regarding the expectation that AMC's international business segment would experience lower attendance and revenues during the summer months.

101.    AMC had repeatedly told investors that it was a seasoned international theater operator. Prior to J.P. Morgan Chase and Apollo Management taking the Company private in 2004, AMC operated in thirteen different foreign countries, including the United Kingdom, Spain, and Portugal. Drawing on their prior experience of operating theaters in the very same countries in which they now sought to acquire theaters, the Individual Defendants reassured investors that they understood the international movie theater business. Accordingly, AMC and the Individual Defendants knew their obligations to disclose to investors the seasonality of AMC's new European operations.

102.    At the Citi Global Internet, Media and Telecommunications Conference on January 5, 2017, Defendant Ramsey represented the following:

> *[W]e do have experience, let me say it that way, operating in international markets*. And if you went back to a time before we were owned by private equity, if you went back into the late 1990s, you would find that *we had theater operations in 13 different countries around the world*. We then became private equity-owned and sold those assets off. *We are an experienced international operator*.
>
> * * *
>
> The strategic direction will come from AMC. *Direction, again, that bears the background and knowledge of all the years that we've successfully operated internationally*. We think the European markets are ripe for remodels and renovations. There have actually been about four remodels in the UK where they did the recliner reseating. Another exhibitor did that. And we watched – studied the box office trends and saw similar improvements in revenues post renovation similar to what we've experienced here in the U.S. So we're quite confident that the recliner remodel strategy will work well.

(Emphasis added.)

103.    Indeed, as the Company certified in the December 2016 Registration Statement, "[o]ur senior management team has experience operating both domestic and international theatres, having at one time operated more than 100 theatres with more than 1,200 screens in 11 countries outside of the United States."

104.     On May 4, 2017, Defendant Ramsey told attendees at the B. Riley & Co. Investor

Conference:

> And then, look at overseas. ***We have participated in overseas markets before. One
> point in time, our company was in 13 different foreign countries. It's not new to
> us***. We got people that shower every morning and come to work, and they've had
> experience running companies in the territories where we're currently operating.
> So didn't scare us.

(Emphasis added.)

105.     The above statements confirm that the Individual Defendants were knowledgeable

about international movie theater markets and thus knew or recklessly disregarded that AMC's

international business would have different seasonal trends which ebbed during the summer.

106.     Regarding AMC's Stubs loyalty program, the 2016 Form 10-K disclosed as

follows:

> As of June 30, 2016, prior to our national relaunch, we had 2,672,000 active
> member households in the AMC Stubs program. As of December 31, 2016, we had
> more than 5,263,000 active member households enrolled in both the AMC Stubs
> Premiere and AMC Stubs Insider programs, combined. New members are enrolling
> in the new AMC Stubs program at a rate greater than 11 times the number of
> enrollments during the same period in 2015. Our AMC Stubs members represented
> approximately 23% of AMC U.S. markets attendance during the year ended
> December 31, 2016. ***We expect the number of member households to continue to
> increase over the next 24 to 36 months***. We believe movie-goers want to be
> recognized and rewarded for attending our theaters and as a result, our new AMC
> Stubs program is designed to strengthen guest loyalty, attract new guests and drive
> additional return visits. Our much larger database of identified moviegoers also
> provides us with additional insight into our customers' movie preferences, and this
> enables us to have both a larger and a more targeted marketing effort to support our
> Hollywood studio partners. ***We intend to creatively mine this rapidly growing
> consumer database to increase sales and otherwise boost loyalty to AMC***.

(Emphasis added.)

107.     The statements above were knowingly or recklessly false and misleading because

the Individual Defendants knew—and only later admitted—that AMC's operating performance

was being adversely affected by an inability to retain or convert Carmike's loyalty program

members to AMC Stubs members after the acquisition. Specifically, the Individual Defendants failed to disclose that, as of the close of the Carmike acquisition, only 200,000 Carmike loyalty program members joined the AMC Stubs program and that AMC "had to start the loyalty program essentially over from scratch," as they later were forced to admit.

108.    The 2016 Form 10-K disclosed the following regarding AMC's renovation plans for Carmike theaters:

> As of December 31, 2016, we now feature recliner seating in approximately 190 theatres, including Dine-in Theatres, totaling approximately 1,984 screens and representing approximately 35% of total legacy AMC screens. By the end of 2017 and 2018, we expect legacy AMC theatres to operate 2,650 and 3,350 screens with recliner seating, respectively. Based on feedback from our guests, we believe there is universal appeal for the ample space, comfort and convenience of our powered recliners, and that appeal will translate into additional attendance in new markets both domestically and in Europe. ***As such, deploying powered recliners will be an integral strategy in the former Carmike and Odeon circuits going forward as we are targeting approximately 42% of our total screens to be comprised of screens with recliner seating by the end of 2021***.

(Emphasis added.)

109.    The statements above were materially false and misleading because Carmike's theaters were experiencing a period of protracted underinvestment and disrepair, a fact that the Individual Defendants knew or recklessly disregarded when disclosing these plans to investors.

110.    The MD&A section of AMC's 2016 Form 10-K also failed to disclose known trends, events, demands, commitments, and uncertainties associated with Carmike's previous operations that were known to management and that were then having, and were reasonably likely to continue to have, a material adverse effect on AMC's capital resources and operational results.

111.    The 2016 Form 10-K also knowingly or recklessly misrepresented that the financial statements contained therein were presented in conformity with Generally Accepted Accounting Principles ("GAAP"), which requires that the financial statements included in the 2016 Form 10-

K disclose the seasonal nature of AMC's business activities. In violation of GAAP, the financial statements in the 2016 Form 10-K failed to disclose that AMC's international business activities experience lower attendance and revenues during the summer.

112.    Item 9A also required the 2016 Form 10-K to furnish the information called for under Item 307 of Regulation S-K, Disclosure Controls and Procedures (*see* 17 C.F.R. §229.307). Item 307 of Regulation S-K required the 2016 Form 10-K to disclose the conclusions that Aron and Ramsey had reached about the effectiveness of AMC's disclosure controls and procedures, defined as the controls and procedures designed to ensure that information required to be disclosed in reports filed with the SEC is appropriately recorded, processed, summarized, and reported. The 2016 Form 10-K falsely and misleadingly represented that AMC's disclosure controls were operating effectively when in fact they were not, for the reasons alleged herein.

113.    Finally, the 2016 Form 10-K contained false and misleading certifications by Aron and Ramsey on AMC's disclosure controls and procedures, which represented and certified, among other things, that the report did not contain any untrue statements or omissions and that the financial statements and financial information included in the report fairly represented the financial condition of the Company for the relevant periods.

114.    ***2017 First Quarter Results and 10-Q***. On May 8, 2017, AMC announced its financial results for the period ended March 31, 2017. Aron commented on the results as follows:

> ***AMC is off to a tremendous and record start in 2017***. AMC's ability to purposefully act on the opportunities and innovations that drive growth continues to set us apart and further solidifies our leadership position among movie-theater operators in the U.S. and Europe. . . . Achieving record first quarter 2017 Adjusted EBITDA of $251.3 million is tangible evidence of what we have been saying for the better part of a year, that ***the earnings power of this new incarnation of a larger and more influential AMC is enormous compared to other operators and even to our own recent past***.

. . . We would particularly point out three important developments at AMC so far this year. First, at the legacy pre-acquisition AMC theaters, we grew revenues at a meaningfully faster pace than the industry at large, due in part to our commitment to renovating theaters and the strength of our impactful marketing programs. Second, **with our domestic acquisition, our rapid move to achieve cost synergies and efficiencies brought immediate bottom line benefit, offsetting revenue weakness that had been prevalent at Carmike for eight of the twelve months and three of the last four months of 2016**. We are directly focused on improving revenues at the acquired domestic theaters, as well as furthering the cost reduction efforts that already are well in hand. And third, we are thrilled both by our brisk start in driving immediate revenue and earnings growth in constant currency in Europe, and the likelihood that our plans to drive even more earnings through renovation of European theaters will come to initial fruition in quantity as early as the end of 2018.

. . . **We are only just beginning to unlock the growth potential of our recent acquisitions. The initial integration efforts of creating a transformed AMC have been done quickly and have been very smooth**. As we now move to make what we expect will be highly lucrative investments in guest-facing initiatives like powered recliner seats, enhanced food and beverage offerings and the expansion of premium large format experiences, **we are as confident as we could be in the future earnings potential of AMC. We remain optimistic about the opportunity to continue to deliver meaningful value to our shareholders both in the balance of 2017 and in the years ahead**.

(Emphasis added.)

115.    After the earnings announcement, AMC held a conference call with analysts and investors on May 8, 2017 to discuss the Company's earnings release and operations. During the call, Aron highlighted AMC's "outstanding" results for Q1 that "exceed[ed] all consensus estimates for both revenue and EDITDA." Aron represented the following, in which he reiterated his rosy spin on the success of AMC's recent acquisitions:

AMC's first quarter was marked most noticeably by our growth to more than 1,000 theaters and more than 11,000 screens, thanks to the closing of our Carmike and Odeon acquisitions late in Q4 '16, and the signing and ahead-of-schedule closing of our Nordic Cinema Group acquisition, wholly within Q1 '17. **Our integration of these added theaters has gone incredibly smoothly and we have moved fast to capture expense synergies that were promised as these acquisitions were announced**.

As for theater enhancement, we quickened the deployment pace for our strategic initiatives, ***with more theaters now equipped with recliner seating than anyone else in our industry***, and their attendant investment return metrics still being quite lucrative and well ahead of the 25% cash-on-cash unlevered returns of our investment hurdles. . . .

***Our marketing activity continues to amaze even us. Literally all of the Carmike Theaters will cut over to the AMC brands, programs, websites and systems by the end of this week, with the Carmike name retired. And speaking of the efficacy of those marketing programs, AMC Stubs partition -- participation continues to soar***. As of today, we have 7,553,209 AMC Stubs member households. We previously announced hitting 5 million member households on December 19 of last year; announced 6 million member households on February 13 of this year; and 7 million member households on April 13, less than a month ago. ***So in a year, we've tripled the Stubs membership to numbers that we believe are light-years ahead of any other exhibitor program and the numbers continue to grow rapidly***.

(Emphasis added.)

116.    Aron's above statements on the smooth and synergistic integration of the Carmike theaters were knowingly or recklessly false and misleading because Aron and the other Individual Defendants never disclosed that Carmike had allowed its theaters to undergo a prolonged period without any capital investment between April and December 2016. As discussed herein, this neglect caused Carmike to lose an increasing percentage of its market share to competitors and would require significant time and investment from AMC to reverse.

117.    Meanwhile, Aron's above statements on the participation in the AMC Stubs loyalty program were knowingly or recklessly false and misleading because Aron failed to disclose AMC's inability to retain or convert Carmike's loyalty program members after the acquisition.

118.    On the same May 8, 2017 call, Aron said the following about AMC's theater renovations:

***We see that our commitment to improving the guest experience continues to serve us and our guests very well***. . . .

As of March 31, 2017, including our Dine-In Theater locations, spot acquisitions, new builds, Dolby Cinema auditoriums and full recliner reseat renovations, AMC operated 2,078 U.S. recliner screens in 208 theaters. ***Of the 75 theaters with***

35

*recliners that have been open for more than a year, these theaters are seeing attendance lifts between 40% and 60%, average ticket price increases of 7% and total revenue increases averaging 64% in the first 12 months after renovation compared to the last 12 months before renovation*.

*Our recliner renovation investments are still comfortably exceeding our 25% unlevered cash on cash return hurdles, while handily outperforming the first quarter U.S. industry box office revenue per screen by 830 basis points and also outpacing U.S. industry attendance per screen by 270 basis points*.

In having more recliner screens than any other U.S. circuit, recliners as a percentage of AMC's U.S. theater count are now 32%, virtually all of them in the legacy AMC circuit and very few in the Carmike circuit. As long as the financial returns stay as solid as they are now, we expect to renovate an additional 118 theaters in the United States, representing 1,480 U.S. screens in 2017 and 2018, which would bring us to 326 recliner-equipped theaters in the U.S. That's about 51% of our entire domestic footprint, including all of the theaters of the newly-acquired Carmike circuit, which were off to a very slow start under prior ownership. *So the opportunity with all these recliner-equipped theaters to deliver outsized performance of returns in the immediate term ahead is clear. Continued investment in our strategic initiatives across both our legacy and acquired theaters will continue to create value for AMC and for our shareholders*.

(Emphasis added.)

119.     The above statements were knowingly or recklessly false and misleading because Aron knew that AMC's operating performance was being adversely impacted by: (i) a protracted period of underinvestment in Carmike's theaters; (ii) a significant loss in Carmike's market share when its patrons migrated to competitors that had renovated and upgraded their theaters; and (iii) AMC's inability to retain Carmike's loyalty program members after the acquisition. These matters were then having and were reasonably likely to continue to have a material adverse effect on AMC's overall operations.

120.     Aron provided additional commentary during the May 8, 2017 conference call on AMC's loyalty program and marketing efforts:

*We could not be more excited about our AMC Stubs loyalty program* and the redesigned website and mobile apps that span the divide between the physical theater setting and the digital experiences our consumers prefer.

As previously mentioned, ***our rapidly growing number of AMC Stubs members accounted for approximately 25% of all ticket sales in Q1, and will soon account for more than 30% of all AMC moviegoers in the United States***. These tens of millions of purchase histories now captured in our database offer us a ***treasure trove of data*** and consumer information for us to use to market AMC and future movie going more effectively.

(Emphasis added.)

121.    The above statements were knowingly or recklessly false and misleading because Aron failed to disclose that AMC's operating performance was being adversely impacted by its inability to retain or convert Carmike's loyalty program members after the acquisition. These matters were then having and were reasonably likely to continue to have a material adverse effect on AMC's operations.

122.    Significantly, Aron unambiguously represented during the May 8, 2017 conference call that the Carmike integration was "running very smoothly" and "[t]here have literally been no operational snafus of any note to report":

> ***The integration of Carmike into AMC is running very smoothly***. As you know, we are retiring the Carmike name and are rebranding all our theaters as AMC, about 400 of the 644; or AMC Dine-In, about 45 of the 644; or AMC Classic, about 200 of the remaining theater locations in the U.S. However, as our AMC and AMC Dine-In Theaters are considerably larger and get considerably more visitation, only about 10% of our revenues will fall under the AMC Classic marquee.
>
> ***We have made great progress with the conversion of the acquired theaters. We only have 2 Carmike theaters as we speak, and by the end of this week, all Carmike theaters will have gone through their cutover to AMC systems, processes and brands. There have literally been no operational snafus of any note to report to you, and the new larger AMC is showing movies every day without pain in a much bigger national footprint***.

(Emphasis added.)

123.    Aron then stated that AMC soon expected to "reverse" Carmike's 2016 "revenue weakness":

. . . with Carmike, we have inherited a circuit that was showing revenue weakness in 8 of the 12 months in 2016 and in 3 of the 4 months in the last trimester of 2016. Candidly, that was one of the allures to us of acquiring Carmike. *As we look to the end of 2017 and into 2018, we are highly confident that AMC's marketing activity and product ideas will generate a meaningful revenue boost to the Carmike theaters just newly added to our domestic platform*.

Fortunately, we were so aggressive in reducing expense and in achieving expense synergies that the cost savings are offsetting short-term revenue softness – again, which I'm quick to add, *we expect to reverse soon* on our watch.

(Emphasis added.)

124.    In response to analysts' questions, Aron misleadingly attempted to minimize the

significance of Carmike's revenue softness:

> *With respect to the Carmike theaters, when I talk about revenue softness, I'm not talking about revenue declines. What I'm talking about is that the AMC Theaters have been growing faster than the Carmike theaters have been growing, if you take, though, the totality of it all*. So no, we're – there's no thought to shuttering any Carmike theaters.
>
> We think we have an A team in place here in Kansas City that has generated great results for AMC over the past year. That's why AMC revenues are up 6.2% when the industry is up 4%, 5%. That same team is now wholly focused on the Carmike theaters, not only from a system basis but also theater-by-theater. *And we're highly confident we're going to make a lot of progress across the Carmike system*.

(Emphasis added.)

125.    Aron continued to downplay the significant, looming issues with Carmike:

> *On the issue of Carmike, I – it's really complicated. There are a lot of Carmike theaters that are doing just great. So we've gotten quite granular looking theater by theater by theater, and there are so many reasons*. And I want to be careful what I say because I don't want to say anything uncharitable to the prior management team. It's a problem that we inherited. It's a problem that we'll solve.
>
> You could imagine, with any company that announced it was for sale in March and got sold in December, that decisions that might have been taken to drive short-term performance might have been put on hold, thinking those are more appropriate decisions that should be taken by the new owner. That's one argument.
>
> *Another argument is some of the Carmike theaters did have competitive activity around them. And they – since Carmike was not a company that really believed*

*in recliner seats, they didn't counter some of that competitive activity by putting in re-seated theaters of their own*. Clearly, that's something that will change.

(Emphasis added.)

126.    Aron went on to contrast AMC's approach to theater renovations with the needs at

some of Carmike's properties, emphasizing the "upside" to come:

> When we have a theater that we renovate, we do it in 3 to 6 months. ***Two of the largest theaters in their system, they shut down for renovation, and I believe they're going to be closed for 15 months – which, again, I know it's only 2 theaters out of 270***, but when they're significant theaters of size and when you're starting to look at all these things on 0.10% here and 1% over there, it matters.
>
> There's a lot more than that. We've already taken 5 of their theaters. For example, that they had as sub-run theaters, meaning they're showing older films, and we've already converted those – at a very deeply discounted price. We've already converted those theaters to first-run movie houses, showing the latest Hollywood releases at full price.
>
> So there are a lot of reasons there – for as many of their theaters, there are sort of reasons that affect big patches of their theaters, and we think we have a solid understanding of what the issues have been, theater by theater, and we're putting in solutions, theater by theater.
>
> The Carmike theaters in question have only been branded as AMC theaters in the last 30, 60, 90 days. The first cut-over was mid-January, and the last cut-over is going to be mid-May. ***So as these theaters become AMC-branded theaters with more potent marketing programs and the like and some targeted investment to improve the product, we think we'll see real benefits***.
>
> ***So we're not at all upset about all this. It's just more upside to come. And I said it before, but I'll say it again, thank goodness we moved fast to get cost synergies because that's one of the things that allowed us to have a blowout quarter, even with these Carmike issues to deal with***.

(Emphasis added.)

127.    The above statements were knowingly or recklessly false and misleading because

Aron knew that the "prior management team" had allowed Carmike's theaters to stagnate without

investment between April and December of 2016 and, as a result, had lost significant market share

to competitors which would take significant time and investment to reverse.

128.    On May 8, 2017, AMC filed with the SEC its Form 10-Q for the quarter ended March 31, 2017, signed by Aron and Ramsey. The Q1 2017 Form 10-Q contained the same materially false and misleading disclosures and omissions detailed above with respect to AMC's 2016 Form 10-K and other statements regarding the operations of Carmike including: (i) the protracted period of underinvestment in Carmike's theaters; (ii) the seasonality of AMC's foreign operations; (iii) the inability to retain or convert Carmike loyalty program members to the AMC Stubbs program; (iv) misstatements and omissions in AMC's MD&A and financial statements; and (v) misstatements and omissions in AMC's disclosure controls and Aron's and Ramsey's certifications thereof.

### Confidential Witnesses in the Securities Class Action Confirm
### the Individual Defendants' Knowledge of Adverse Facts

129.    Confidential witnesses interviewed in connection with the securities fraud class action pertaining to these same matters confirmed the Individual Defendants' knowledge of the materially false and misleading statements and omissions discussed herein.

130.    For example, CW-1, employed by AMC as a systems administrator between June 2011 and December 2017, confirmed that AMC originally considered acquiring Carmike in 2014, but ultimately "pulled the plug" after its due diligence uncovered unexpected issues and weaknesses.

131.    According to CW-1, the Company's potential acquisition of Carmike was first examined by AMC's executive leadership in 2014. CW-1 stated that, during this earlier review, he/she and other AMC employees were scheduled to visit Carmike's headquarters in Atlanta, Georgia, to conduct a thorough review of its information technology ("IT") infrastructure. CW-1 stated that such a review never occurred, as AMC's management came to the conclusion that Carmike was a "lemon."

132. CW-1 corroborated exactly what AMC was later forced to admit in August 2017—namely, that Carmike suffered from an extended period of underinvestment. According to CW-1, Carmike had been outsourcing its IT infrastructure needs to save money, thereby necessitating "major renovations" to its IT infrastructure. CW-1 also noted that the Carmike theaters needed updates to their physical equipment, including theater wiring, as well as hardware, such as projectors.

133. According to CW-1, AMC constantly "struggled" with the outdated state of Carmike's theaters, as it was difficult to determine how to support the equipment in its theaters and network them operationally. CW-1 explained that, while AMC eventually developed a process for integrating each Carmike theater, it had to employ a "paradigm shift" in order to accommodate these newly-acquired theaters.

134. According to CW-1, the process of integrating and renovating the infrastructure of the Carmike theaters remained ongoing from the close of the acquisition until the end of his/her tenure in December 2017.

135. The statements made by CW-1 were echoed by CW-2, one of 12 Carmike district managers, who was employed by Carmike from October 2005 to December 2016.

136. According to CW-2, who was responsible for overseeing about 10% of Carmike theaters located in 12 states across the western United States, approximately 70% of the theaters he/she managed were in "disrepair," a figure that CW-2 relayed was likely true for the entire population of Carmike theaters.

137. CW-2 stated that, in some cases, even more critical renovations and repairs were not approved by Carmike's corporate offices when theaters suffered losses. By way of example, CW-2 said that it took *years* to get corporate approval to fix a broken HVAC system on the roof

of one of his/her managed theaters. In fact, CW-2 stated that Carmike "consciously neglected" the theater chain and that, as a result, the cost to update the circuit would be "huge."

138.    Carmike's Schedule 14A filed with the SEC on October 11, 2016 states that AMC called off its earlier 2015 bid to acquire Carmike because AMC's "management and board grew increasingly less comfortable with the terms of the transaction." At the time, defendants Zhang, Saich, Hill, Koch, and Pawlus served on AMC's board of directors.

139.    As noted below, at the end of the relevant period in August 2017, when the Individual Defendants finally disclosed to investors that Carmike's operations had been suffering because of underinvestment, Aron falsely stated that Carmike failed to make investments in its theaters after AMC announced its intention to merge with Carmike in March 2016. Aron stated, in pertinent part, that "when you look at what Carmike as a company did between April and December [of 2016] to modernize its circuit after it put itself under contract to be sold, it didn't do very much. And so the circuit essentially went on dead stop around April-ish of – remember, we put them under contract in March, April-ish of '16. . . ." CW-2, however, confirmed that Carmike had pursued an extremely slow pace of making renovations to its theaters for a period of at least three to four years preceding the announcement that AMC would acquire Carmike, and that there was no change in the pace at which Carmike renovated its theaters following the acquisition announcement in March of 2016.

140.    CW-2 also stated that Carmike meticulously tracked the operational and financial performance of its theaters, and that it compiled and disseminated detailed profit and loss reports on the status of each theater on a monthly basis. Moreover, CW-2 confirmed that a significant number of theaters in Carmike's circuit had been losing money for the last few years.

141.    CW-2 relayed that corporate personnel in Carmike's headquarters provided AMC with operational and financial data about Carmike during AMC's due diligence process. Based on conversations with personnel in Carmike's headquarters, CW-2 learned that AMC representatives began working out of Carmike's headquarters on a daily basis beginning in April 2016.

142.    CW-2 stated that none of Carmike's data was off limits to the AMC representatives, and added that, by the summer of 2016, Carmike executives directed its managers to give the AMC representatives access to "whatever they wanted," including operational and financial data that was recorded on a real time basis. CW-2 reiterated that the AMC representatives had direct access to Carmike's data for months during their due diligence process.

143.    CW-2 also stated it was clear that Carmike's theaters were underperforming and that it was common knowledge among the employees and executives at Carmike that the theater chain was experiencing significant revenue weaknesses during AMC's due diligence process. In fact, CW-2 believes that Carmike's former CEO, David Passman, had acknowledged in some manner that Carmike would have gone bankrupt in six months without AMC's acquisition deal.

144.    As Aron acknowledged during AMC's December 20, 2016 investor conference call, the Company's due diligence process, which included working with the DOJ as part of its antitrust examination, provided the Individual Defendants with detailed knowledge, both positive and adverse, about Carmike's operations prior to the acquisition.

145.    The Individual Defendants also knew that, contrary to its U.S. business operations, AMC's newly-acquired international operations were slower during the summer season.

146.    CW-3 served as a Senior Project Manager contractor on the Company's Odeon integration project from September 2016 to January 2017. In this capacity, CW-3's team was responsible for receiving, mapping, and integrating Odeon's financial reporting data into AMC's

Hyperion Financial Management system ("Hyperion"), which CW-3 explained was AMC's financial planning and budgeting software program. The technical business lead for CW-3's team working on integrating the financial reporting of Odeon's business with AMC was Ryan Gound, AMC's Director of Accounting Systems.

147.    According to CW-3, AMC began receiving raw financial data from Odeon in September 2016, and such data was successfully mapped and integrated into the Company's Hyperion system by December 31, 2016. CW-3 confirmed that the information received from Odeon and integrated into the Company's Hyperion system was granular enough to allow the Individual Defendants to understand monthly and seasonal financial performance trends in Odeon's business.

148.    Additionally, according to CW-4, a former Senior Director of Enterprise Applications and Operations from April 2017 to March 2018, AMC had intended to convert all prior members of Carmike's loyalty program to the AMC Stubs program but that it was too expensive for AMC to "auto enroll" members and, therefore, AMC was dependent on Carmike loyalty program members signing themselves up for AMC's program.

### The Truth Comes Out

149.    On August 1, 2017, after the market closed, AMC announced its preliminary financial results for the 2017 second quarter, ending June 30, 2017. AMC announced that it expected to report total revenues during the quarter of approximately $1.2 billion and a net loss in the range of $178.5 to $174.5 million—a loss of $1.36 to $1.34 per diluted share. The announcement also stated that AMC's 2017 revenues were expected to be between $5.10 and $5.23 billion and its 2017 net loss to be between $150 and $125 million—a loss of $1.17 to $0.97 per diluted share.

150.     In response to these significantly worse-than-expected results, the price of AMC common stock plummeted nearly 27% on very heavy trading volume, falling from $20.80 per share on August 1, 2017 to $15.20 per share on August 2, 2017—a 57% drop from its most recent high of $35.45.

151.     On August 4, 2017, AMC held a conference call with analysts and investors to discuss the Company's preliminary second quarter results. Aron commented flatly that the second quarter was "simply a bust," highlighting several reasons for the Company's poor results, including admitting for the first time that "Q2, seasonally, is often the smallest quarter of the year in Europe."

152.     During Q&A, a securities analyst asked if there was "a reason why [they] weren't able to disclose [the seasonality of AMC's international business]?" In response, Aron used the false pretext of AMC's international operations being accounted for under international accounting standards as the reason for the Company's prior non-disclosure.

153.     After the release of AMC's 2017 second quarter preliminary earnings results, securities analysts discussed the seasonality of AMC's international business, including an observation from one analyst that it "played a role in our (and likely the Street's) mismodeling of the quarter."

154.     Aron also finally highlighted Carmike's performance as a major contributor to AMC's poor 2017 second quarter results, stating that "[o]ur legacy AMC theaters were stars, outperforming the industry, but our acquired Carmike theaters . . . were not stars." He explained that during the 2017 second quarter, the box office results in the entire United States were down 4.4% while, in contrast, admissions revenues at legacy AMC theaters—largely renovated with new reclining seats—were down only 3.1%. However, the newly-acquired Carmike theaters suffered an extreme ***11.3% revenue decline*** during Q2—nearly triple the national average.

155.     Aron also dismissed the "substantial savings" AMC had realized during the quarter, noting that it was "all absorbed by and offset by higher operating costs."

156.     During Q&A, Aron explained that Carmike's poor 2017 second quarter performance was caused by "literally six" different issues that had been having a material adverse effect on Carmike's operations and patron attendance, which AMC estimated would take until at least 2018 to resolve. Among these issues was a significant loss in market share when its patrons migrated to competitors that had renovated and upgraded their theaters as well as AMC's inability to retain or convert Carmike's loyalty program members after the acquisition.

157.     Aron confessed regarding Carmike's loss of market share and lack of investment:

[W]e mentioned this a little bit on the first quarter call, as we went back and looked, in 8 of the 12 months in '16, Carmike, as a circuit, had declining market share, including 3 of the past – 3 of the 4 months between September and December, *it had declining market share. When you look at what Carmike as a company did between April and December to modernize its circuit after it put itself under contract to be sold, it didn't do very much. And so the circuit essentially went on dead stop around April-ish of – remember, we put them under contract in March, April-ish of '16, and we didn't get to change that until December of '16.* What we found is that we've already gone through each of the several hundred Carmike theaters one by one with this – across the top – departmental team that I've told you about, and *there are literally six different reasons that tend to come up most often as to what's going on* in a particular theater.

(Emphasis added.)

158.     Aron also admitted AMC's inability to retain or convert Carmike's loyalty program members:

I'll give you another. When Carmike was handed over to us on December 21, only 200,000 individuals from their loyalty program joined our loyalty program. Even though – even though, at the same time, AMC has over 9 million people from our loyalty program coming – stemming out of the – by then, it would have been about 7 million in the loyalty program. *So we've had to start the loyalty program essentially over from scratch.*

(Emphasis added.)

159.    Aron then discussed Carmike's poor performance and how long it might take for AMC to turn it around:

> And as I said, there have been many identified issues. And they got to be knocked down one at a time. And as we looked at the issues that were floating around the Carmike circuit, ***about 40% of the attendance issues in the Carmike circuit was because somebody came into town and put a recliner theater near a Carmike theater and Carmike never responded***. . . . ***Another issue for Carmike is it had 2 of its biggest, most successful theaters that were closed for renovation***. And the theaters were closed for over a year. And they're just coming back on stream this summer. So we're going to get a material bump theoretically by 2 of their biggest, strongest and best-performing theaters finally reopening and coming back online. And it's literally issue-by-issue. . . . Can we turn this circuit around in 9 months? So is it January to March of '18? Or is it taking us 12 months and it's January to June of '18? Or does it taking us slightly longer than that? I don't know. But ***I'm hopeful that we can get it sorted out and turned in the first half of '18***.

(Emphasis added.)

160.    As a result of the materially false and misleading statements and omissions alleged herein, AMC common stock traded at artificially inflated prices throughout the relevant time period. By making or otherwise permitting these statements, the Individual Defendants materially misled the investing public, thereby inflating AMC's stock price. These statements and omissions as alleged herein were materially false and misleading in that they failed to disclose material, adverse information and misrepresented the truth about the Company and its business.

**The Securities Class Action**

161.    In the *Hawaii Structural Ironworkers Pension Trust Fund v. AMC Entertainment Holdings, Inc* securities class action, the plaintiff filed securities law claims on behalf of investors who purchased AMC stock between December 20, 2016 and August 1, 2017 and suffered investment losses. There, the plaintiff alleges that AMC and its officers and directors made false and misleading statements to a class of stock purchasers during the class period, in violation of the Securities Exchange Act of 1934 and the Securities Act of 1933.

162.    In particular, the plaintiff alleges that during the class period, the defendants made false and misleading statements touting AMC's integration of several acquired companies and its post-merger business prospects, while failing to disclose numerous problems and pitfalls with those integration efforts and their disastrous effects on the Company, which ultimately caused AMC's stock price to crater when the full truth was revealed to investors.

163.    The securities plaintiff's allegations are further supported by four confidential witnesses who shared personal knowledge of the defendants' conduct, including the defendants' knowledge of the serious problems being hidden from investors.

164.    By order dated September 23, 2019 (Docket 137), U.S. District Court Judge Alison J. Nathan denied in part defendants' motion to dismiss the securities claims, finding that the plaintiff had sufficiently alleged that the defendants had omitted material information regarding Carmike's underinvestment in its theaters, Carmike's loyalty program, and the seasonality of the Company's European business, and that the plaintiff plausibly alleged that the defendants either failed to disclose or failed to update their disclosures of material information to investors.

165.    Judge Nathan also ruled that the plaintiff sufficiently pled loss causation and standing and that the Company's directors and officers—including all persons named as defendants herein— were control persons of the Company. Specifically, Judge Nathan ruled that defendants Aron and Ramsey were control persons under Section 20(a) of the Exchange Act because they "signed the Registration Statement and other SEC filings." The Court similarly ruled that all of the individual defendants in the class action—including all of the Individual Defendants here—were control persons under Section 15 of the Securities Act because "all of the Individual Defendants either 'signed the registration statement personally or through an attorney-in-fact.'"

## HARM TO THE COMPANY

166.     As alleged herein, securities class action litigation was filed against AMC and its officers and directors, and Judge Nathan denied in substantial part the motions to dismiss the asserted claims. Judge Nathan sustained claims against the Company under the rigorous pleading standards established by the Private Securities Litigation Reform Act of 1995. The Individual Defendants' conduct has not only caused a massive decline in shareholder value, but has also exposed AMC to huge liability to stock purchasers, including huge defense costs. As AMC's recent Form 10-K for 2019 filed with the SEC on February 28, 2020 notes, an unfavorable outcome in the securities case could include monetary damages, with a possibility of a material adverse impact on AMC's business operations.

167.     Additionally, AMC has incurred other costs, including but not limited to costs incurred from compensation paid to defendants who breached their duties to AMC. AMC's business, goodwill, and reputation with its business partners, shareholders, and the capital markets have been gravely impaired. The credibility and motives of management are now in serious doubt, and AMC's ability to raise equity capital or debt on favorable terms in the future is now impaired. The Individual Defendants' actions complained of herein severely damaged AMC.

## DERIVATIVE AND DEMAND EXCUSAL ALLEGATIONS

168.     Plaintiff brings this action derivatively on behalf of AMC pursuant to Federal Rule of Civil Procedure 23.1 to redress injuries suffered, and to be suffered, by AMC as a direct result of violations of the breaches of fiduciary duty alleged herein. AMC is named as a nominal defendant solely in a derivative capacity.

169.     Plaintiff will adequately and fairly represent the interests of AMC in enforcing and prosecuting its rights and has hired experienced counsel. Plaintiff has no interests adverse to AMC.

Plaintiff was a shareholder of AMC at the time of the wrongs complained of, has continuously been a shareholder since that time, and is a current AMC shareholder. Accordingly, Plaintiff has standing to bring this derivative action on behalf of the Company to recover damages and other relief for all of the conduct described herein.

170.    Plaintiff has not made a pre-suit demand on the AMC board to institute this action because such a demand would be a futile and useless act, and, therefore, is excused. AMC is controlled by its board, which at the time this action was commenced, consisted of 11 members, 8 of whom are the Current Director Defendants named as defendants herein.

171.    The Current Director Defendants making up a majority of the AMC board are named as defendants in the securities class action for violations of the federal securities laws. These directors moved to dismiss the Section 11 and Section 15 securities law claims filed against them in that case, but Judge Nathan denied the motions. These claims remain in ongoing litigation as of the date of the filing of this complaint, where each Current Director Defendant faces a substantial likelihood of liability for their actions. A majority of the current board is therefore personally conflicted with respect to considering a shareholder demand. None of the Current Director Defendants could in good faith pursue the Company's claims while defending themselves against claims in another case based on similar facts, and which expose them personally to massive class action liability.

172.    The pendency of these claims for violating the federal securities laws renders it impossible for each of the Current Director Defendants to objectively and impartially consider a stockholder demand as to the wrongdoing alleged herein. If the Company pressed forward with its rights of action in this case, then the Company's efforts would undercut or even compromise the defense and settlement of the securities class action, making demand futile. Thus, the Current

Director Defendants are neither independent of, nor disinterested in, the outcome of this shareholder derivative litigation and demand is accordingly futile and therefore excused.

173.    The materially false and misleading December 2016 Registration Statement was signed by each of the Current Director Defendants (Aron, Zhang, Zeng, Saich, Hill, Locke, Koch, and Pawlus). These defendants, who comprise a majority of AMC's board, each face a substantial likelihood of liability for their breaches of fiduciary duty because each made the false, misleading, and otherwise improper statements contained in the Registration Statement. Each of the Current Director Defendants further faces a substantial likelihood of liability for knowingly authorizing or recklessly permitting the making of other improper statements in AMC's Forms 10-Q and 10-K, press releases, and other public statements regarding AMC's business prospects, financial guidance, and comments to financial analysts. Due to his or her participation in these wrongful acts alleged and corresponding risks of individual financial exposure for their conduct, each of the Current Director Defendants is not disinterested and cannot exercise independent business judgment on the issue of whether AMC should prosecute this action. None of the Current Director Defendants did anything to prevent the wrongful conduct alleged herein. These directors knew of the unlawful acts, participated in the actions of their colleagues, and permitted these breaches of fiduciary duty. The Current Director Defendants would never sue themselves or their colleagues to recover damages or for other relief. As a result, demand on AMC's board of directors is futile and therefore excused.

174.    Of the Current Director Defendants, defendants Zhang, Saich, Hill, Koch, and Pawlus, in particular, face an even greater likelihood of liability for their breaches of fiduciary duty in connection with the false and misleading statements concerning the problems plaguing Carmike's theaters, further excusing demand. These defendants were AMC directors in 2014 and

2015, when AMC's "board grew increasingly less comfortable" with the Carmike acquisition. AMC abandoned the Carmike deal at the time due, at least in part, to Carmike's underinvestment in its theaters that AMC uncovered during due diligence—the very same problems that AMC encountered when it announced that it would acquire Carmike on March 3, 2016, just a year later.

175.　　Additionally, in order to bring this action for breaches of fiduciary duty, the members of AMC's board would have to sue themselves and/or their fellow directors and allies in the top ranks of the Company. Annually, non-executive directors are currently paid cash retainers of $150,000, are granted annual stock awards valued at $70,000, and receive additional compensation for AMC committee membership or serving as a chairperson. Committee members each receive an additional $5,000 annually, while the Chairpersons of the Compensation Committee and Nominating and Corporate Governance Committee and the Audit Committee receive an additional $10,000 and $20,000, respectively.　Given their financial interests in their positions and the materiality of this compensation, these defendants would never pursue the Company's claims.

176.　　The acts complained of herein constitute violations of fiduciary duties owed to AMC and its shareholders as well as violations of law and, therefore, are incapable of ratification. Because the Current Director Defendants' actions were illegal and non-ratifiable, demand is excused as a matter of law.

177.　　Demand is further excused for the additional reasons that follow.

178.　　<u>Non-Independent Directors Aron, Zhang, Zeng, Locke, and Koch</u>. Aron serves as one of the Company's executives. According to the Company's 2019 Proxy Statement filed with the SEC, Aron, Zeng, Locke, and Koch are not independent directors under applicable listing standards, excusing demand. AMC's Form 8-K filed with the SEC on December 3, 2019

announcing Zhang's reelection to AMC's board as a director similarly states that Zhang is not independent under applicable listing standards, excusing demand. Additionally, Aron would never vote to pursue this action because to do so would jeopardize his primary source of income, including substantial executive compensation.

179.    <u>Audit Committee Defendants Pawlus, Hill, and Saich</u>. Defendants Pawlus, Hill, and Saich served on AMC's Audit Committee during the relevant period. AMC designated defendants Pawlus and Hill as "financial experts" within applicable SEC regulations at all relevant times. During portions of the wrongful conduct alleged herein, defendants Pawlus and Hill each served as Audit Committee Chairpersons. Collectively, defendants Pawlus, Hill, and Saich are referred to herein as the "Audit Committee Defendants."

180.    Throughout the relevant period, the Audit Committee's principal duties included overseeing: (i) AMC's financial reporting process and internal control system; (ii) the performance of AMC's internal audit function; and (iii) AMC's compliance with legal, ethical, and regulatory matters. However, throughout the relevant period, the Audit Committee Defendants either: (i) failed to exercise their fiduciary duties to monitor the integrity of the Company's financial statements, its press releases regarding AMC's financial condition, and its internal controls over financial reporting; or (ii) knew about the deficiencies in the Company's internal controls and financial communications and not only failed to correct such deficiencies but also permitted the Company to falsely represent that its internal controls over financial reporting were sufficient and that its press releases accurately reflected AMC's financial condition.

181.    As a result of the Audit Committee Defendants' failures to fulfill their fiduciary duties, AMC has been exposed to substantial liability in the securities class action and has incurred, and is likely to continue to incur, substantial expense. Therefore, the Audit Committee Defendants

face a substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Accordingly, any demand upon the Audit Committee Defendants to pursue the claims at issue in this action would be futile, and is therefore excused.

182. <u>Nominating and Corporate Governance Committee Defendants Locke, Koch, and Saich.</u> Defendants Locke, Koch, and Saich served on AMC's Nominating and Corporate Governance Committee during the relevant period, with defendant Saich serving as the committee's Chairperson during the wrongful conduct alleged herein. Collectively, defendants Locke, Koch, and Saich are referred to herein as the "Nominating and Corporate Governance Committee Defendants."

183. The Nominating and Corporate Governance Committee Defendants were charged with oversight of the AMC board and management, as well as the development and recommendation to the board of corporate governance guidelines and internal control principles. The Nominating and Corporate Governance Committee Defendants' services on this AMC committee were a sham in that they took no action whatsoever to ensure that an adequate system of internal controls was in place, as demonstrated by the Company's failure to make accurate and truthful public statements throughout the relevant period. Therefore, the Nominating and Corporate Governance Committee Defendants face a substantial likelihood of liability for breach of their fiduciary duties. Accordingly, any demand upon the Nominating and Corporate Governance Committee Defendants to pursue the claims at issue in this action would be futile, and is therefore excused.

**COUNT I**
**Breach of Fiduciary Duty**
*Against the Individual Defendants*

184. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

54

185.     The Individual Defendants, as current or former AMC officers and/or directors, owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

186.     By virtue of their positions as AMC directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

187.     Each Individual Defendant was required to: (a) use his or her ability to control and manage AMC in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of AMC rather than his or her own interests.

188.     By their acts alleged herein, including but not limited to causing AMC to issue false and misleading statements while concealing material adverse information and failing to ensure that the Company maintained adequate internal controls regarding financial disclosures, the Individual Defendants each breached their fiduciary duties.

189.     The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

190.     AMC has been injured as a direct and proximate result of the Individual Defendants' wrongful conduct.

**COUNT II**
**For Contribution and Indemnification**
**Under the Securities Exchange Act of 1934**
***Against the Individual Defendants***

191.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

192.    The Individual Defendants named in this Count are named as defendants in the related securities class action pending before this Court. The conduct of these defendants has exposed the Company to significant liability under various federal securities laws by their disloyal acts.

193.    The Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein. If AMC is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts.

194.    The Company is entitled to contribution and indemnification from these defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

195.    As officers and directors, the Individual Defendants had the power and ability to, and did, control or influence, either directly or indirectly, AMC's general affairs, including the content of its public statements, and had the power and ability to directly or indirectly control or influence the specific corporate statements and conduct that violated section 10(b) of the Exchange Act, SEC Rule 10b-5, and other securities laws.

196.    The Individual Defendants are liable under Section 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Securities Exchange Act of 1934.

197.    The Individual Defendants accordingly have damaged the Company and are liable to the Company for contribution and/or indemnification.

198.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## COUNT III
### Rescission of Employment Contract Compensation
### Under Section 29(B) of The Exchange Act
### *Against Defendants Aron and Ramsey*

199.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though full set forth herein.

200.    Defendants Aron and Ramsey named in this Count are named as defendants in the related securities class action pending before this Court. The conduct of these defendants has exposed the Company to significant liability under various federal securities laws by their disloyal acts.

201.    Exchange Act Section 29(b), 15 U.S.C. § 78cc(b), provides in pertinent part as follows:

> Every contract made in violation of any provision of this chapter or any rule or regulation thereunder and every contract … heretofore on hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void … as regards the rights of any person who in violation of any such provision, rule or regulation shall have made or engaged in the performances of contract.

202.    Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

203.    Defendants Aron and Ramsey violated the federal securities laws while performing their duties under various agreements they had with AMC, and AMC is entitled to rescission of those agreements.

204.    AMC was and is an innocent party with respect to Defendants Aron's and Ramsey's Exchange Act violations.

205.     Defendant Aron's compensation for the fiscal year ended December 31, 2016 totaled $10,932,004. This compensation included $991,200 in salary, a $4.5 million bonus, $4,281,202 in stock awards, $1,144,250 in non-equity incentive plan compensation, and $15,352 in all other compensation.  Defendant Aron's compensation for the fiscal year ended December 31, 2017 totaled $7,447,156. This compensation included $1.1 million in salary, $5,605,208 in stock awards, $726,000 in non-equity incentive plan compensation, and $15,948 in all other compensation.

206.     Defendant Ramsey's compensation for the fiscal year ended December 31, 2016 totaled $2,659,220. This compensation included $563,800 in salary, a $700,000 bonus, $962,930 in stock awards, $48,906 in change in pension value and nonqualified deferred compensation earnings, $363,078 in non-equity incentive plan compensation, and $20,506 in all other compensation. Defendant Ramsey's compensation for the fiscal year ended December 31, 2017 totaled $2,347,070. This compensation included $650,000 in salary, $1,399,997 in stock awards, $126,217 in change in pension value and nonqualified deferred compensation earnings, $150,150 in non-equity incentive plan compensation, and $20,706 in all other compensation.

207.     Plaintiff, on behalf of AMC, seeks rescission of the contracts between Defendants Aron and Ramsey and AMC due to these defendants' violations of the Exchange Act while performing their job duties.

208.     As a result of the foregoing, AMC is entitled to rescission of these agreements and contracts and/or return of all monies and benefits previously paid thereunder.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of AMC, demands judgment as follows:

A.      Determining that this suit is a proper derivative action and certifying Plaintiff as an appropriate representative of AMC for said action;

B.      Declaring that the Individual Defendants have violated their fiduciary duties to AMC and its shareholders;

C.      Awarding disgorgement of improper compensation and damages to AMC as a result of the Individual Defendants' breaches of fiduciary duties, in an amount to be determined at trial, together with prejudgment and post-judgment interest;

D.      Equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including (a) the institution of appropriate corporate governance reforms and internal control improvements to remediate and prevent the recurrence of the misconduct alleged herein, and (b) attaching, impounding, imposing a constructive trust on, or otherwise restricting the Individual Defendants' assets so as to assure that Plaintiff has an effective remedy;

E.      Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 20, 2020

                                     **NEWMAN FERRARA LLP**

By: _____
                              Jeffrey M. Norton

Jeffery M. Norton
1250 Broadway, 27th Floor
New York, NY 10001
Phone:        (212) 619-5400
Facsimile:    (212) 619-3090
jnorton@nfllp.com

**SCHUBERT JONCKHEER & KOLBE LLP**
Robert C. Schubert
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Phone:        (415) 788-4220
Facsimile:    (415) 788-0161
rschubert@sjk.law

*Attorneys for Plaintiff Lorra Manuel*

DocuSign Envelope ID: 2B08BA16-07F4-4307-B3D7-0EC246448585

## **VERIFICATION**

I, Lorra Manuel, hereby declare as follows:

I am a plaintiff in this action. I verify that have read the foregoing Verified Shareholder Derivative Complaint and authorize its filing. To the extent the allegations in the Verified Shareholder Derivative Complaint are based on my personal knowledge, they are true; to the extent they are based on information and belief through investigation of my counsel, I believe them to be true.

Executed on __March 19, 2020__, in __Chicago__, Illinois. I declare under penalty of perjury that the foregoing is true and correct.

Lorra Manuel